# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Case No. 21-cr-0386-2 (TNM)** |
| | * | |
| **PAULINE BAUER,** | * | |
| **Defendant** | * | |
| | * | |

## REPLY

Pauline Bauer, by her undersigned stand-by counsel, hereby replies to the Government's Opposition to her Motion to Dismiss the § 1512(c)(2) count (ECF 86).

## INTRODUCTION

The indictment fails to allege facts establishing that Ms. Bauer "corruptly" obstructed "any official proceeding." 18 U.S.C. § 1512(c)(2). The six pages that the government spends in its Opposition alleging facts not contained in the Indictment and in many instances involving acts done by others not associated with Ms. Bauer do not change Ms. Bauer's essential claim.[1] As the cases explain, and the rule of lenity requires, corruptly obstructing an official proceeding requires an allegation that a defendant acted corruptly to affect the integrity or availability of evidence destined for a proceeding. But no such acts are alleged in this case.

---

[1] Moreover, even though the government argues in its Opposition that Ms. Bauer "forced her way" into the Capitol on January 6 (ECF 86 at 2), in the Statement of Offense that it recently filed in her codefendant's case, the government makes no such assertion. Instead, it only asserts that Ms. Bauer and her codefendant walked "past law enforcement officers" and then "made their way into the Capitol Rotunda." ECF 77 at 3, ¶9. Similarly, the photograph of a half-open "smashed-out" Capitol window is time-stamped two minutes before Ms. Bauer is alleged to have entered the Capitol at 2:43 (ECF 86 at 3). At that time, the door was fully open and the broken glass was not visible. (ECF 86 at 4).

The government cited no precedent directly supporting its open-ended and broad interpretation of § 1512(c)(2), which would reach all attempts to influence Congressional proceedings but only at the whim of the prosecution and not based on any standard or limiting principle heretofore identified. This lack of standard can be seen in the fact that Ms. Bauer's codefendant was charged only with misdemeanors while she is charged with a 20-year felony obstruction offense although they came to DC from Pennsylvania together, remained together throughout the day, entered and exited the Capitol at the same time and their conduct, as set out in his plea agreement, was identical vis a vis any claim of obstruction of an official proceeding.[2] It is this lack of

Indeed, every single case that the Government has cited involves "core" conduct made unlawful by § 1512(c)(2) namely, acts that corruptly affect the integrity or availability of evidence. That is because until January 6, every single prosecution under § 1512(c)(2) in the 22 years since its enactment involved allegations that defendants interfered with the integrity or availability of information destined for a proceeding. That singularity is also found in the cases not brought under § 1512(c)(2). Every time a Congressional hearing has been disrupted by one or more persons, none of those persons has been prosecuted under § 1512(c)(2). Indeed, the government was unable to muster any binding or persuasive authority holding that political protest no matter how large or disorderly not aimed at affecting the integrity of evidence is covered by § 1512(c)(2).[3]

---

[2] *See* Statement of Offense (ECF 77), filed 11/15/2021. While Ms. Bauer is alleged to have pushed a law enforcement officer after the officer shoved her back, she is not in fact charged with any such offense. She had no weapons and there is no allegation that she injured the officer or anyone else on January 6.

[3] The cases recently decided by judges in this district will be addressed below.

As in *Yates v. United States*, 574 U.S. 528 (2015), in using § 1512(c)(2) to prosecute Ms. Bauer, the government makes a category mistake. In *Yates,* the Court held that § 1519's criminalization of tampering with any "record, document or tangible object" did not cover a dead fish tossed overboard because, "[m]indful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups," the legislature plainly meant objects that record or preserve information – the lifeblood of any "proceeding." *Yates*, 574 U.S. at 532. A companion to §1519, also enacted as part of Sarbanes Oxley, § 1512(c) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . or otherwise obstruct[ing], influenc[ing], or imped[ing] any official proceeding." Section 1512(c) likewise does not reach acts of political protest (even were it to amount to other criminal conduct) that do not intentionally affect the flow or quality of information in a proceeding. If it did, the rest of Chapter 73 would be surplusage.[4]

Similarly, the meaning of "official proceeding," the *ejusdem generis* and *noscitur a sociis* canons, and the "corruptly" element mutually reinforce that the government attempts to jam a square peg in a round hole. That is why obstruction of justice statutes have never been used to prosecute acts having no tie to the quality or availability of evidence in a proceeding; why in ordinary language we call political protesters "riotous" or "mob-like" but not "corrupt"; and why over a century of federal jurisprudence does not yield an example of an obstructed "proceeding" that did not involve an inquiry or investigation.

---

[4] The "mens rea" and nexus limitations on § 1512(c)(2)'s reach do nothing to avoid mass surplusage because the other sections in Chapter 73 carry the same "limitations."

The Court should construe the statute to avoid the serious constitutional problems that would arise were § 1512(c)(2) to be applied to Ms. Bauer's non-violent acts and statements. In its Opposition (ECF 86), the government does not meaningfully distinguish any of the authorities cited by Ms. Bauer concerning the vagueness doctrine, the First Amendment, the rule of lenity and the novel construction principle. Binding precedent makes clear that Ms. Bauer cannot be held liable under a new enlargement of a criminal statute retroactively applied solely to her and a select group of defendants. As the government does not limit its § 1512(c)(2) charges in any legally meaningful manner, does not allege that Ms. Bauer impaired or tampered with evidence or testimony, and alleges that Ms. Bauer acted "corruptly," a term that the D.C. Circuit has found unconstitutionally vague the charges under § 1512(c)(2) must be dismissed.

Moreover, in this particular case, the fact that the conduct at issue implicates First Amendment activities requires this Honorable Court to act with heightened scrutiny. When activity that falls within the shadow of the First Amendment is alleged to be criminal, courts are required to apply the strictest standards of judgment in ensuring that only intentional criminal activity is prosecuted and not constitutionally protected actions, beliefs or associations. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-19 (1982) (boycott activity, which was not itself violent, that resulted in the loss of business profits was constitutionally protected); *Noto v. United States*, 367 U.S. 290, 299-300 (1961) (requiring "rigorous standards of proof" in Smith Act prosecutions). Nothing in the Government's Opposition eliminates the vagueness issues present in this case.

I.   **The Government's Use of an Obstruction Statute to Prosecute Demonstrators Is A Novel Application of the Law and Violates the Vagueness Doctrine and the Rule of Lenity**

The fact that the government has been unable to cite to a single case where a court has applied its interpretation of § 1512(c)(2) - outside the context of adjudicatory proceedings and investigations and to acts unrelated to the integrity or availability of evidence – means that applying that construction retroactively against Ms. Bauer is a prototypical due process violation under the novel construction principle. *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) ("[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." If a "legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a [court] is barred by the Due Process Clause from achieving precisely the same result by judicial construction." An "unforeseen judicial enlargement" is one that has no support in precedent before the criminal act); *United States v. Lanier*, 520 U.S. 259, 266 (1997) (*Bouie* still good law).

The question is not whether the verbs cover obstructive acts generally but obstructive acts unrelated to evidence impairment or availability – like every other part of § 1512.  Because no court had ever held so, it is hard to see how a reasonably intelligent person would have notice that (c)(2) "plainly cover[s]," for example, appearing in Congress without permission.   Moreover, the government does not explain how or why a reasonably intelligent person would be on notice that a Chapter 73 obstruction statute would be applied to a "proceeding" not involving an investigation, evidence, or adjudication.  Indeed, over a century of obstruction of justice jurisprudence would put such a person on notice that the joint session of Congress on January 6 was not a Chapter 73 "proceeding" because it did not involve an investigation, evidence, or adjudication.

The evidence of arbitrariness inherent in the government's use of § 1512 in the January 6 cases is significant. Over 100 times the government has entered into Class B misdemeanor plea agreements with defendants whose conduct is identical to that of Ms. Bauer, who is facing up to 20 years in prison. The government has ventured no explanation whatsoever to distinguish why a person falls into the misdemeanor category versus the serious felony one. No fair and impartial court system can respond to this enormous problem with drastic consequences for people's lives by ignoring it, particularly in the context of the First Amendment political activities that were at the heart of Ms. Bauer's presence in DC on January 6. The vagueness doctrine prohibits the situation where a vague interpretation of a criminal statute enables arbitrary and discriminatory enforcement.

As Justice Gorsuch recently explained, vagueness doctrine, which is rooted in the due process clause of the Fifth Amendment, is applied specifically to prevent "the exercise of arbitrary power." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring). For vague laws "leav[e] people in the dark about what the law demands and allow[] prosecutors and courts to make it up." Id.[5] Here, the point is not that the Court should direct the government which charges to file. The perspective, rather, is that of a reasonably intelligent defendant. If the government is charging hundreds of people with a Class B misdemeanor for the same conduct that randomly results in a felony charge punishable by 20 years of prison time, the issue is whether the crimes are sufficiently

---

[5] The *Fokker Servs. B.V.* decision, relied on by the *Sandlin* Court, does not hold otherwise. That case did not concern vagueness doctrine. The government and defendant entered into a deferred prosecution agreement and filed a motion to toll the Speedy Trial Act to make it work. 818 F.3d at 737. The district court denied the motion on the ground that it was unhappy with deferred prosecution and would hold out on the Speedy Trial Act until it got the charges it wanted. *Id.* The D.C. Circuit reversed, holding that courts do not have the power to hold a Speedy Trial Act motion hostage on such grounds. *Id.* This uncontroversial and quite easy decision has nothing to say about the scope of vagueness doctrine.

demarcated to put a defendant on notice of her dramatically increased criminal liability.  In these cases, the government has provided no notice, much less fair notice, of when or why a defendant moves from a Title 40 offense to a § 1512 charge.  This is a gross absence of "standards to govern the actions of police officers, prosecutors, juries and judges," *Dimaya*, 138 S. Ct. at 1212.

Although no court before the January 6 prosecutions had applied § 1512(c)(2) to proceedings not involving adjudication or investigations and to acts unrelated to evidence, and although multiple courts in the district have acknowledged that the issues are challenging and difficult, Judge Friedrich in *Sandlin* found no "grievous ambiguity."[6] (citing *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).  This was in error.  In the first place, in the *Yates* decision the Court applied an "any doubt" standard of ambiguity, not the "grievous ambiguity" standard.  574 U.S. at 548 ("[I]f our recourse to traditional tools of statutory construction *leaves any doubt* about the meaning of 'tangible object,'. . . we would invoke the rule [of lenity].") (emphasis added); *accord Guertin*, 2022 WL 203467, at *3 (applying the *Yates* "any doubt" standard for rule of lenity).  *Yates* postdates *Barber*.  *See also Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) ("[C]ontrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime.") (cleaned up).  In addition, although the *Sandlin* Court cites to *United States v. Lanier*, 520 U.S. 259 (1997), it did not address that decision's novel construction principle.  Even if the government's interpretations of § 1512(c)(2) were somehow unambiguously correct and not void-for-vagueness, they still concededly lack any supporting precedent.  It is a violation of the due process clause to apply them retroactively to conduct that occurred before any court had adopted those understandings of

---

[6] *See United States v. Sandlin*, __ F. Supp. 3d __, 2021 WL 5865006, at *10 (D. D.C., 2021)

the statute. *Lanier*, 520 U.S. at 266 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)).

## II.   The Government's Interpretation Renders "Otherwise" Surplusage

If subsection (c)(2) reaches any and all obstructive acts, the words "or otherwise" have no meaning. That is because the subsection would reach just as far if it simply read, "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding . . .shall be fined. . ." Conversely, a construction of subsection (c)(2) that reaches conduct directed at undermining the proceeding through actions that affect the integrity and availability of evidence *beyond document impairment*, gives meaning to the word "otherwise" in subsection (c)(2).

The government's own cases do Ms. Bauer's work for her. In every § 1512(c)(2) decision cited by the government and found by counsel, "otherwise" performs the task of capturing conduct that, while not "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object," §1512(c)(1), yet still "otherwise" constitutes actions impairing the *integrity and availability of information* used in the "official proceeding":

- *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance constituted evidence sufficient for jury to find "efforts were out of a desire *to influence what evidence came before the grand jury*") (emphasis added);

- *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation evidence sufficient to find purpose was to "*thwart evidence from reaching the investigation*") (emphasis added);

- *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (attempting to obtain false statement *to be used in pending federal charges* sufficient to satisfy § 1512(c)(2));

- *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (making false statements "*directly to the grand jury itself*" sufficient to satisfy § 1512(c)(2)) (emphasis original);

- *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (false responses to interrogatories *that were filed in the official proceeding* sufficient to satisfy § 1512(c)(2));

- *United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (making false statements to outside counsel "so that counsel *would provide misleading information to the grand jury*") (emphasis added).

The government's § 1512(c)(2) cases provide positive proof that Ms. Bauer's construction of § 1512(c)(2) gives meaning to "or otherwise obstructs. . ." while the government's interpretation improperly leaves that phrase surplusage.

*Begay v. United States*, 553 U.S. 137 (2008) is dispositive here. There, the Court used *ejusdem generis* to determine what crimes were covered by the statutory phrase "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or *otherwise involves* conduct that presents a serious potential risk of physical injury to another." 553 U.S. at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis added). *Begay* held that the "otherwise involves" provision covered "only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id.* Had Congress intended the latter "all encompassing meaning," "it is hard to see why it would have needed to include the [preceding statutory] examples at all." *Id.*

As the *Begay* court itself found, the adverb "otherwise" is defined to mean "in a different way or manner." 553 U.S. at 144 (quoting Webster's Third New International Dictionary 1598 (1961)). In turn, the word "different" is an adjective that means "not of the same kind: partly or totally unlike." DIFFERENT, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/different. More specifically, it is a comparative adjective, which by its definition involves a relationship between two or more subjects. COMPARATIVE, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/comparative. Section 1512(c)(2) begins with the phrase "or otherwise obstructs. . ." Therefore, it does not "stand alone" in any relevant grammatical sense.

Section 1512(c)(2) is not an independent clause because "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned" contains neither a subject nor a complete predicate. The predicate is not complete because the meaning of "or otherwise obstructs, influences, or impedes any official proceeding" cannot be determined without reference to the verb or verbs by which the comparative adverb "otherwise" by its definition modifies the verbs that follow it. If § 1512(c)(2) is not an independent clause it is a dependent clause, which means it is "connected to the main clause of a sentence." DEPENDENT CLAUSE, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dependent%20clause. The clause to which § 1512(c)(2) is "connected" is § 1512(c)(1). Thus, § 1512(c)(2) is not "independent of" § 1512(c)(1) in any relevant grammatical sense.

Therefore, the "otherwise" provision in § 1512(c)(2) is not grammatically distinct from that in *Begay*. That leaves only the *Begay* issue whether the "otherwise" conduct charged here is a "similar crime" to the ones enumerated in § 1512(c)(1). 553 U.S. at 142. By "similar crimes" *Begay* meant "crimes that are roughly similar in kind as well as in degree of risk posed to the [enumerated] examples themselves." *Id.* at 143. There, the "example crimes" were "burglary, arson, extortion and crimes involving the use of explosives." *Id. Begay* held that DUI was not "similar" to those because "the listed crimes involve purposeful, 'violent' and 'aggressive' conduct," which driving intoxicated did not necessarily entail. *Id.*

Here, the government proposes that § 1512(c)(2) reaches obstructive acts that do not intend to affect the integrity or availability of evidence used in a proceeding. It is easy to grasp why Ms. Bauer's interpretation of § 1512(c)(2) satisfies *Begay* but the government's does not. Mr. Crowl's

interpretation of "or otherwise obstructs" is not limited to physical evidence destruction of the type enumerated in § 1512(c)(1).  However, the conduct her interpretation captures is still a "similar crime" to the enumerated list.  To use the government's own cases, although soliciting false testimony (§ 1512(c)(2)) is not identical to document shredding (§ 1512(c)(1)), it is *Begay*-similar because both crimes involve acts intended to affect the integrity or availability of evidence in a proceeding.  *Volpendesto*, 746 F.3d at 286; *Phillips*, 583 F.3d at 1265; *Petruk*, 781 F.3d at 447; Carson, 560 F.3d at 585; *Burge*, 711 F.3d at 809; *Ring*, 628 F. Supp. 2d at 223.

Notwithstanding all the surplusage, even if the Court were to somehow find the government's construction formally correct, it is certainly not "clearly" so.  Thus, the Court would turn to § 1512(c)(2)'s legislative history.  *Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 460 (1987) (review of legislative history appropriate to resolve statutory ambiguity).  Section 1512(c) was added in the Sarbanes-Oxley Act of 2002 (SOX).  That legislation was "principally aimed to 'prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.'" S. Rep. No. 107-146, at 2 (2002).  Senator Trent Lott, the member of Congress who introduced the amendment that would be codified at § 1512(c), specifically explained its purpose.  148 Cong. Rec. S6542 (daily ed. July 10, 2002).  Namely:

> [This section] would enact stronger laws against *document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

*Id.* at S6545 (emphasis added).

Senator Hatch added that § 1512(c) would "close [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. *Id.* The legislative history is thus clear that § 1512(c)(2) was enacted to reach conduct that affected the integrity and availability of evidence.

### A.   The Government's Interpretation Renders the Rest of § 1512 and Much of Chapter 73 Surplusage

The government's interpretation of § 1512(c)(2) not only fails to give meaning to its phrase "or otherwise obstructs . . ." It also renders the other provisions in § 1512 surplusage, unlike Ms. Bauer's construction. *Yates*, 547 U.S. at 542 ("We resist a reading of [an obstruction statute] that would render superfluous an entire provision passed in proximity as part of the same Act."). If § 1512(c)(2) covers any act that obstructs, influences or impedes any official proceeding, it does not merely "overlap" with some other criminal section. It renders useless swathes of Chapter 73, all of which are covered by the government's § 1512(c)(2) construction but concern more particular conduct that courts must assume Congress did not craft in vain:

- **§ 1503,** defined above, criminalizes whoever corruptly, or by threats or force, or by any threatening letter or communication, influences, intimidates, or impedes jurors, officers of the court, law enforcement officers, or the administration of justice;

- **§ 1505** criminalizes, among other things, "Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress"

- **§ 1510** criminalizes those who willfully endeavor by means of bribery to obstruct the communication of information relating to a violation of any criminal statute of the United States to a criminal investigator.

- **§ 1513** criminalizes those who retaliate against witnesses, victims or informants in official proceedings.

- **§ 1519** criminalizes "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States. . ."

In analyzing the last section above, § 1519, *Yates* illustrates that the rule against surplusage, and the interpretive canons *ejusdem generis* and *noscitur a sociis*, do not countenance a reading of § 1512(c)(2) that covers all obstructive acts regardless of whether they intend to affect the integrity of availability of evidence in a proceeding.

## III.   *YATES* PLAINLY BARS THE GOVERNMENT'S INTERPRETATION OF § 1512(C)(2)

The government's attempt to distinguish *Yates* from the interpretive question here is as unpersuasive. That decision militates against the government's reading of § 1512(c)(2) through its application of (i) the doctrine against surplusage; (ii) the canons of *ejusdem generis* and *noscitur a sociis*; and (iii) the rule of lenity.

First, in *Yates* the government contended that § 1519's "tangible object" in the phrase "any record, document, or tangible object" covered all physical objects, such as a dead fish, not just those that contain information. 574 U.S. at 542. The Court rejected this construction – citing first the rule against surplusage. If § 1519's "tangible object" covered all physical objects, it would render as surplusage § 1512(c)(1), which proscribes "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object. . ." 574 U.S. at 542. As shown above, the government's surplusage problem is far worse than in *Yates*. If § 1512(c)(2)'s "or otherwise obstructs" covers all acts regardless of whether they intend to affect the integrity or availability of evidence, it renders as surplusage all of § 1512 and many other provisions in Chapter 73.

There is no support in *Yates*, or anywhere else, that § 1512(c)(2), or any other provision in § 1512, covers acts that do not intend to affect the integrity or availability of any kind of evidence, including objects-containing-information (*Yates*), objects-not-containing-information (§ 1512(c)(1)), or any other non-object information.

Second, *Yates* applied *ejusdem generis* and *noscitur a sociis* to limit "tangible object" to an object used to record or preserve information because the phrase followed a list of words separated by commas, each noun of which recorded or preserved information (records, documents). Under *noscitur a sociis*, "a word is known by the company it keeps to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543 (cleaned up). Section 1519 proscribes "'alter[ing], destroy[ing] . . . *falsif[ying] or mak[ing] a false entry in* any record, document, or tangible object.'" 574 U.S. at 543 (citing § 1519) (emphasis original). The italicized verbs "typically take as grammatical objects . . . things used to record or preserve information." Thus *noscitur a sociis* counseled limiting "tangible object" to evidence that is used to record or preserve information.

Under *ejusdem generis*, "where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 574 U.S. at 544 (cleaned up). That counseled in favor of interpreting "tangible object" to mean evidence that records or preserves information given that it followed "record[s], document[s]." *Id.* "It is highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind *in a provision targeting fraud in financial record keeping*." *Id.* (emphasis added). Here, the exact same analysis requires rejection of the government's interpretation of § 1512(c)(2). Section 1512(c)

criminalizes "whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object . . . or otherwise obstructs, influences, or impedes any official proceeding . . ." Under *noscitur a sociis*, Section 1512(c)(2)'s "or otherwise obstructs" is surrounded by words that *concern evidence impairment*, if not always impairment of physical evidence.

Under *ejusdem generis*, § 1512(c)(2)'s "or otherwise obstructs" follows this enumerated list: "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object. . ." Again, while it may be reasonable to find that "or otherwise obstructs" reaches beyond tampering with physical evidence to include non-physical evidence, as for the contention that the phrase reaches acts that have nothing to do with evidence, "[i]t is highly improbable that Congress would have buried a general . . . statute covering [obstructive acts not concerning evidence] of any and every kind in a provision targeting fraud in financial record keeping." *Yates*, 574 U.S. at 544.

Finally, *Yates* held that if "recourse to traditional tools of statutory construction leaves any doubt about the meaning of 'tangible object'. . .we would invoke the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 548.  Lenity was particularly appropriate because the government "urge[d] a reading of [an obstruction statute] that exposes individuals to 20-year prison sentences for tampering with *any* physical object that *might* have evidentiary value in *any* federal investigation into *any* offense. . ." *Id.* (emphasis original).  "[B]efore we choose the harsher alternative, [we] require that Congress . . . [speak] in language that is clear and definite." *Id.*  Lenity is even more appropriate here.  The government exposes defendants to a 20-year prison sentence for *any* act, which i it deems obstructive *whether or not* it concerns evidence integrity or availability, in any "proceeding" *whether or not* it concerns an inquiry or investigation.  The government's interpretation of § 1512(c)(2) floats in space, tethered

to nothing more than its nonpublic charging decision-making.

### III.   The Government Has Not Distinguished the Dc Circuit's *Poindexter* Decision Which Controls the Resolution of Mr. Crowl's Motion to Dismiss the Section 1512(c)(2) Counts

The D.C. Circuit's decision in *Poindexter* controls the resolution of this case. *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir.1991), *cert. denied*, 506 U.S. 1021 (1992).  None of the government's arguments seeking to distinguish *Poindexter* are well-founded. *Poindexter* has not been overturned by the D.C. Circuit and is not distinguishable.  Just as Ms.  Bauer, Poindexter challenged the application of an obstruction statute (18 U.S.C. § 1505) on the ground that use of the term "corruptly" rendered the statute unconstitutionally vague as applied to this conduct". [11] The text of § 1505 and § 1512(c)(2) are identical, in all material respects. Both subsections proscribe the same *actus reus* when done "corruptly." Poindexter was also alleged to have obstructed a Congressional proceeding.

Of significance to the instant case, *Poindexter* recognized that obstruction aimed at Congressional proceedings presented a different analytical framework in determining whether the statute was unconstitutionally vague. In contrast to attempts to influence or impede judicial proceedings, attempts to influence Congress, a political body, were commonplace and not of a criminal nature. *See Poindexter*, 951 F.2d at 377-78. (The term corruptly "must have some meaning ... because otherwise the statute would criminalize all attempts to "influence" congressional inquiries – an absurd result that the Congress could not have intended in enacting the statute"); *United States v. Russo*, 104 F.3d 431, 436 (D.C. Cir. 1997) (in contrast to *Poindexter's* concern that not all efforts to obstruct Congress can be criminalized, "very few non-corrupt ways to or reasons for intentionally obstructing a judicial proceeding leap to mind"). Thus, all the cases cited by the government which

16

involve obstruction of judicial proceedings and related grand jury investigations are inapposite to resolving Mr. Crowl's challenge.

### A.   The *Poindexter* Holding - "Corruptly" is Unconstitutionally Vague

In 1990, John Poindexter, President Reagan's National Security Advisor was convicted on two counts, among others, of obstruction of justice in violation of 18 U.S.C. § 1505 for making false and misleading statements to congressional committees and for participating in the preparation of a false chronology, deleting information from his computer and arranging a meeting at which Oliver North gave false statements. *Poindexter*, 951 F.2d at 377. The D.C. Circuit reversed the two obstruction convictions, holding that the word "corruptly" as used in § 1505 was unconstitutionally vague as applied to Poindexter's prosecution. First, the Circuit held that applying § 1505 to Poindexter's false and misleading statements to Congress would require an "intransitive" rather than a "transitive" reading of the word "corruptly." In other words, read intransitively, "corruptly" requires that the defendant is or becomes corrupt; read transitively, the defendant could corrupt another by causing the other person to act corruptly. Based on § 1505's language and structure, the Circuit found that the statute favored a transitive reading. Second, the Circuit held that the term "corruptly" was too vague to provide constitutionally adequate notice that it proscribed lying to Congress. *Id*. at 379.

In response to the Poindexter decision, Congress enacted a statutory definition of the term "corruptly." For purposes of Section 1505 only, "corruptly" now is defined by statute as "acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b) (emphasis added).[12] With that statutory change, Congress addressed the first

17

vagueness problem identified by the court in *Poindexter*. Persons charged under § 1505 now have notice that Congress intended the word "corruptly" in § 1505 to apply in both the transitive and the intransitive sense. A defendant who corrupts himself as well as one who corrupts another can be prosecuted under 18 U.S.C. § 1505. However, by its terms, the amendment enacted by Congress only applies to § 1505 prosecutions so that the transitive/intransitive issue still presents a vagueness problem in the instant case. And the government has not relied on § 1515(b) in its opposition.

*Poindexter* held that reading the term "corruptly" was unconstitutionally vague:

> [C]orruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements." A "corrupt" intent may also be defined as "the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others.
> . . .
> We must acknowledge that, on its face, the word "corruptly" is vague; that is, in the absence of some narrowing gloss, people must "guess at its meaning and differ as to its application."
> . . .
> The various dictionary definitions of the adjective "corrupt" quoted in North I do nothing to alleviate the vagueness problem involved in attempting to apply the term "corruptly" to Poindexter's conduct.
>
> "Vague terms do not suddenly become clear when they are defined by reference to other vague terms." Words like "depraved," "evil," "immoral," "wicked," and "improper" are no more specific – indeed they may be less specific – than "corrupt." (A dictionary definition quoted in North I also mentions "bribery" and the like, but no such conduct is at issue on this appeal.). As used in § 1505, therefore, we find that the term "corruptly" is too vague to provide constitutionally adequate notice that it prohibits lying to the Congress.

*Poindexter*, 951 F.2d at 378-79. (internal citations omitted).

*Poindexter* was not the first time that the D.C. Circuit found the terms "corrupt" and

"corruptly" unconstitutionally vague. *See, e.g., Ricks v. District of Columbia*, 414 F.2d 1097, 1106 (D.C. Cir.1968) (invalidating vagrancy statute as unconstitutionally vague) ("Immoral," and its synonyms "corrupt, indecent, depraved, dissolute," afford "an almost boundless area for individual assessment of the morality of another's behavior.").

*Poindexter* remains good law in the D.C. Circuit. The out-of-circuit cases the government cites do not undermine *Poindexter* as precedent nor weaken the strength of the D.C. Circuit's reasoning. The cases cited by the government also present a different vagueness analysis under *Poindexter* as they involve "core" behavior to which obstruction statutes may constitutionally be applied and none involve proceedings before Congress or implicate First Amendment activities. *See Poindexter,* 951 F.2d at 385. *Poindexter* is not limited to § 1505 prosecutions and has not been rejected by the D.C. Circuit as the government claims.  In fact, contrary to the government's contention, in *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996), the D.C. Circuit applied *Poindexter* in a § 1512 case. *Morrison* rejected the as-applied challenge to the § 1512 conviction precisely because the defendant had committed "transitive" corruption in the *Poindexter* sense by endeavoring to persuade a witness "to give specific false testimony" in a judicial proceeding and offering the witness "some furniture if she signed the affidavit." *Morrison*, 98 F.3d at 621-22; *see also United States v. Kanchanalak*, 37 F. Supp. 2d 1, 4 (D.D.C. 1999) (Friedman, J.) (finding that even after Congress amended § 1515 in the wake of *Poindexter* to define "corruptly" for purposes of § 1505, § 1515's definition of "corruptly" to mean acting with an "improper purpose" is still unconstitutionally vague under *Poindexter*). Thus, *Morrison* extended *Poindexter* to a § 1512(b). Unlike in the present case, however, the core behavior at issue in *Morrison* fell within a constitutional application of "corruptly" as it involved the offer of a bribe in connection with a

criminal trial.

Moreover, the government fails to note that other circuits have adopted or expressed support for the *Poindexter* analysis in § 1512 prosecutions. For example, the Third Circuit applied *Poindexter* in a § 1512 prosecution. *See United States v. Davis*, 183 F.3d 231, 249 (3rd Cir. 1999) ("We approved of *Poindexter's* reasoning in the § 1512 context in *United States v. Farrell*"); *United States v. Farrell*, 126 F.3d 484 (3d Cir.1997) (there must be something more inherently wrongful about the persuasion (such as bribery or encouraging someone to testify falsely). The Ninth Circuit has also approved of the *Poindexter* analysis. *See United States v. Aguilar*, 21 F.3d 1475 (9th Cir.1994), *aff'd in part and rev'd in part*, 515 U.S. 593 (1995) (finding "most helpful" *Poindexter*'s holding "that the term "corruptly," as used in 18 U.S.C. § 1505, was unconstitutionally vague as applied to Poindexter's false statements to Congress").

The cases cited by the *United States v. Shotts*,145 F.3d 1289 (11th Cir. 1998) provides little support for the proposition that *Poindexter* should not be extended beyond § 1505. First and foremost, *Shotts* involved allegations of tampering with a grand jury witness, *id.* at 1292, which unlike Ms.  Bauer's charges, are the "core" behavior to which the obstruction statute may constitutionally be applied. *See United States v. Russo*, 104 F.3d 431, 436 (D.C. Cir. 1997) (noting The cases cited by the *United States v. Shotts*,145 F.3d 1289 (11th Cir. 1998) provides little support for the proposition that *Poindexter* should not be extended beyond § 1505.  First and foremost, *Shotts* involved allegations of tampering with a grand jury witness, *id.* at 1292, which unlike Ms.  Bauer's charges, are the "core" behavior to which the obstruction statute may constitutionally be applied. *See United States v. Russo*, 104 F.3d 431, 436 (D.C. Cir. 1997) (noting difference between judicial and congressional settings).

As the D.C. Circuit noted,

> One can imagine any number of non-corrupt ways in which an individual can intend to impede the work of an agency or congressional committee. . . .The problem for the Poindexter court, then, was to discern some special meaning in the word "corruptly," some meaning "sufficiently definite, as applied to the conduct at issue. . . Otherwise "the statute would criminalize all attempts to 'influence' congressional inquiries – an absurd result that the Congress could not have intended in enacting the statute." We have no such problem in this case. Anyone who intentionally lies to a grand jury is on notice that he may be corruptly obstructing the grand jury's investigation.

*Russo*, 104 F.3d at 436.

Moreover, *Shott* relies on faulty circular reasoning. *See United States v. Doss*, 630 F.3d 1181, 1189 (9th Cir. 2011) ("construing "corruptly" to mean "for an improper purpose" – especially if that improper purpose is to hinder an investigation or prosecution (which is already required by the statute) – is circular, essentially rendering the term "corruptly" surplusage). In any event, the out-of-circuit cases cited by the government are not binding on this Court, are factually inapposite or mention *Poindexter* in dicta. In each of those cases, courts upheld obstruction counts as-applied to conduct relating to judicial, not Congressional proceedings, which present an entirely different situation in a vagueness analysis of obstruction cases, a distinction which *Poindexter* itself recognized. *See Poindexter*, 951 F.2d at 385 ("the language of § 1505 is materially different from that of § 1503"); *Russo*, *supra*.

**B.     The Supreme Court Has Not Abrogated *Poindexter***

The government's citation of *United States v. Edwards,* 869 F.3d 490, 502 (7th Cir. 2017) for the proposition that *Poindexter* is no longer good law because it preceded *Arthur Andersen,* where the Supreme Court "did not imply that the term [corruptly] was too vague" is simply wrong.

21

For one, the Supreme Court's failure to "imply" a holding provides zero precedential value. Indeed, *Arthur Andersen* did not address the vagueness issue at all as it should not have once it determined that the instruction defining "corruptly" was deficient in allowing for innocent conduct to for the basis of a conviction. *See Arthur Andersen LLP v. United States,* 544 U.S. 696, 706-07 (2005). Once the Supreme Court reversed the conviction on the basis of a faulty jury instruction, it would necessarily refuse to address the vagueness issue on the principle of constitutional avoidance. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

Indeed, the Supreme Court's decision in *Arthur Andersen*, vacating a conviction under 18 U.S.C. § 1512(b) where jury instructions "diluted the meaning of "corruptly" such that it covered innocent conduct" supports the *Poindexter* holding. 544 U.S. 696, 697 (2005). While the Supreme Court did not address whether the term "corruptly" was unconstitutionally vague as applied to Arthur Andersen's conduct, its decision to vacate the conviction supports Mr. Crowl's vagueness argument. and is contrary to the government's definition of corruptly. In *Arthur Andersen*, the government insisted on excluding "dishonestly" from the definition of "corruptly." *Arthur Andersen LLP,* 544 U.S. at 706–07.

> The District Court agreed over petitioner's objections, and the jury was told to convict if it found petitioner intended to "subvert, undermine, or impede" governmental factfinding by suggesting to its employees that they enforce the document retention policy. These changes were significant. No longer was any type of "dishonest[y]" necessary to a finding of guilt, and it was enough for petitioner to have simply "impede[d]" the Government's factfinding ability. . . .By definition, anyone who innocently persuades another to withhold information from the Government "get[s] in the way of the progress

of" the Government. With regard to such innocent conduct, the
"corruptly" instructions did no limiting work whatsoever.

*Id.*

## IV.  Congress Certification of the Electoral College Vote Is Not an Official Proceeding

In dismissing a case for failure to state an offense, this Court very recently addressed the

definition of "official proceeding" in a § 1512(c)(2) prosecution.  *See United States v. Guertin*, No.

No. 1:21-cr-262 (TNM), 2022 WL 203467, at *7 (D. D.C. 2022).  Applying the *Guertin* standard

to Ms. Bauer's case clearly shows that the facts alleged in the Indictment cannot support a conviction

because "Congress certification of the Electoral College vote as set out in the Twelfth Amendment

of the Constitution of the United States and 3 U.S.C. §§ 15-18" is not an "official proceeding" under

18  U.S.C. § 1512(c)(2).

As the Court explained,

> In Section 1512(c)(2), the word "official" appears before
> "proceeding," textually limiting covered proceedings to those bearing
> indicia of officiality.   *See* 18 U.S.C. § 1512(c)(2); cf. Official,
> Oxford English Dictionary (3d ed. 2004) (defining the term as
> "characteristic of an official; formal, ceremonious").    And
> throughout § 1512, Congress used the phrase "official proceeding" in
> a manner that connotes a formal hearing in which persons are called
> to appear.  *See*, *e.g.*, 18 U.S.C. § 1512(a)(1)(A) (making it unlawful
> to kill with intent to "prevent the attendance or testimony of any
> person in an official proceeding"); id. § 1512(a)(2)(B)(iii) (making it
> unlawful to cause a person to "evade legal process summoning that
> person to appear as a witness, or to produce a record, document, or
> other object, in an official proceeding"); id. § 1512(d)(1) (making it
> unlawful to "intentionally harass[ ]" a person to dissuade him from
> "attending or testifying in an official proceeding").
>
> The definitional provisions in § 1515(a)(1) buttress that reading. As
> relevant here, § 1515 defines an "official proceeding" as one "before
> a Federal government agency." *Id.* § 1515(a)(1)(C). The word

"before" suggests an "official proceeding" would typically entail convening a formal tribunal or adjudicative body before which parties are compelled to appear. *See* Before, Oxford English Dictionary (3d ed. 2004) (defining the term as "[i]n front of so as to be in the sight or hearing of; in or into the presence of"; "in giving evidence or answering a charge").

And the requirement that any proceeding be before "a federal government agency," 18 U.S.C. § 1515(A)(1)(C), suggests the statute only covers those proceedings where officials act as a representative of the agency. Indeed, § 1515(a)'s neighboring definitional provisions use "official proceeding" in exactly that sense, each referring to a formal body convened to exercise the power of a broader governmental unit. *See, e.g.*, 18 U.S.C. § 1515(a)(1)(A), (B) (defining "official proceeding" to include "a proceeding before a judge or court of the United States," "a proceeding before ... a Federal grand jury," or "a proceeding before the Congress").

Taken together, § 1515(a)(1) and § 1512 make clear that a covered "proceeding before a Federal government agency" must resemble a formal tribunal. *See Ermoian*, 752 F.3d at 1171 (defining an "official proceeding before a Federal Government agency" as "an agency sitting as a tribunal"); *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008) (defining the same as a "formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency").

*United States v. Guertin*, 2022 WL 203467, at *7 (D. D.C. 2022).

While Congress' certification of the Electoral College vote bears "an indicia of officiality" as this Court noted in *Guertin*, Congress' certification lacked the adjudicatory function that this Court also referenced. On January 6, Congress was not sitting as a tribunal in which parties are directed or called to appear. Congress was not "adjudicating" evidence. An adjudicatory function goes hand in hand with the "core" conduct of obstruction statutes that criminalize acts intended to obstruct the integrity and availability of evidence.[7] In this case, there was no adjudicatory function

---

[7] Judge Moss' point about what Congress "could have said" in defining § 1512 should be rejected. *See United States v. Montgomery,* 2021 WL 6134591, at *8 (D. D.C. 2021). First, what

and no obstruction of the integrity and availability of evidence.  Thus, the Indictment fails to state an offense under § 1512(c)(2).

### A.     Congress' Electoral Certificate Counting Powers Are Ministerial, Not Adjudicative

Any claim that Congress's Electoral College vote certification is an "adjudicatory proceeding" conflicts with the Constitution and the government's own theory of the case.  First, the basic premise of the January 6 investigation is that a mob attempted to stop the Electoral College vote certification after being misled by the former President into believing that Congress could reject electoral certificates affected by "massive voter fraud."  The former President's claim was inaccurate in a key respect.  Congress does not possess the "adjudicative" power to reject procedurally valid electoral certificates for reasons other than authentication.  The government ignores the statement of the most outcome-influencing official in the vote certification, the presiding officer of the electoral count.  On January 6, the vice president stated that the former president was wrong, that the duties of the presiding officer were "largely ceremonial," not "adjudicative." Ltr. of Vice President Mike Pence, Jan. 6, 2021, available at: https://bit.ly/2WVy9s0.

Second, the Constitution does not endow Congress with "adjudicative" powers to "look behind" procedurally valid Electoral College certificates.   The so-called Elector Clauses merely provide that the Electors of the Electoral College shall send certified lists (certificates) of their

---

Congress "could have said" is not a recognized interpretive canon.  Second, comparing 1505's "inquiries and investigations" to 1512's "official proceeding" misses the point.  The comparison is between 1505's "proceeding" and 1512's "[official] proceeding."  The correct interpretive canon looks to how Congress and the courts understood the term "proceeding" before passage of Sarbanes Oxley.  Here, the pre-Sarbanes Oxley 1505 cases like *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 2009) hold that "proceeding" requires adjudication.

presidential votes to the "Seat of Government of the United States," where the President of the Senate

> shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes *shall* then be *counted*. The Person having the greatest Number of Votes *shall* be the President, if such Number be a Majority of the whole Number of Electors appointed. . .

U.S. Const. art. II, § 1, cl. 3 (emphasis added).[8]

The Twelfth Amendment keeps the same procedural structure except requires that each Elector cast one electoral vote for president and one for vice president. U.S. Const. amend. XII. The consensus view among leading constitutional scholars is that "counting" is a ministerial, not a judicial act. *See*, *e.g.*, Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1712 (2002); Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap*, 48 Ark. L. Rev. 215, 229 (1995) ("In counting votes, Congress performs in effect a ministerial function, registering the will of the voters in the electoral college."); *Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021, available at: https://www.wsj.com/articles/congress-sowed-the-seeds-of-jan-6-in-1887-11616086776.

This is shown in several ways:

**Philadelphia Convention of 1787.** The Framers rejected a proposal by James Madison and Hugh Williamson to insert the phrase "who shall have balloted" after the word "Electors." The purpose of this proposal was "so that the non-voting electors not being counted might not increase the number necessary as a majority of the whole – to decide the choice without the agency of the Senate." Kesavan, 80 N.C. L. Rev. at 1713 (quoting 2 The Records of the

---

[8] *See also* U.S. Const. art. II, § 1, cl. 1-2, 4.

Federal Convention of 1787 at 515 (Max Farrand ed., 1911)). John Dickinson successfully moved to insert after "Electors" the word "appointed." Thus, under the Elector Clauses, the requisite number of electoral votes needed for victory is "a Majority of the whole Number of Electors Appointed." U.S. Const. art. II, § 1, cl. 3. This history suggests that the Framers considered the possibility that there might not be a "vote," *but only if an elector shall not have balloted*. They did not consider the possibility that an electoral vote might be unconstitutional because, say, vote tabulation machines did not recognize Sharpie ink. Kesavan, 80 N.C. L. Rev. at 1713.

**The Elector Clauses' immediacy principle**. The Twelfth Amendment provides that once the President of the Senate has opened all of the Certificates, "the votes shall *then* be counted." U.S. Const. amend. XII (emphasis added). And in the case of electoral deadlock, the House of Representatives is to "immediately" choose the next president from those on the list. *Id.* At the Convention, James Wilson said, "If the election be made as it ought as soon as the votes of the electors are opened & it is known that no one has a majority of the whole, there can be little danger of corruption." Kesavan, 80 N.C. L. Rev. at 1715 (citing 2 Farrand, at 502). The immediacy principle implies that the counting agents may not delay in counting the electoral certificates. This militates against an "adjudicative" interpretation of "counting," as a judicial-like role necessarily entails deliberation not immediacy.

**Separation of powers principles.** If Congress had a substantive role in selecting the president, it would collapse the separation of powers. As Gouverneur Morris explained at the time, "if the Executive be chosen by the Legislature, he will not be independent [of] it; and if not independent, usurpation and tyranny on the part of the Legislature will be the consequence." 2 Farrand, at 57.[9]

All of this explains why the government falls back on the obscure objection procedures of the Electoral Count Act of 1887 (ECA) to establish its "adjudicative proceeding" argument. Here, the government runs into a constitutional briar patch. As explained above, neither the Elector Clauses nor the Twelfth Amendment give Congress "adjudicative" power to reject authentic Electoral College certificates. Moreover, the Twelfth Amendment gives Congress no power to enact

---

[9] Congress's role in presidential elections can *become* "adjudicative" in the case of electoral deadlock, *i.e.*, where *the properly certified* electoral votes do not yield a majority to a presidential candidate. U.S. Const. amend. XII. But there was no deadlock on January 6 and the government's "adjudicative" argument does not rest on that contingency but rather on Congress's purported power to reject validly certified electoral votes.

legislation to enforce its provisions, unlike subsequent amendments expanding the franchise. *Cf.* U.S. Const. amend. XV, § 2. The Necessary and Proper Clause will not work to that end.[10] Yet in the ECA Congress purported to grant itself the power to reject electoral certificates that "have not been so regularly given by electors whose appointment has been so certified." 3 U.S.C. § 15. Because the Constitution does not permit Congress to exercise that power to the extent it reaches beyond procedural authentication of the certificates, the ECA is generally regarded as "merely precatory" to avoid constitutional conflict. Kesavan, 80 N.C. L. Rev. at 1793. Thus, the government's argument that the ECA shows that congressional joint sessions to count electoral votes are necessarily adjudicative conflicts with the Elector Clauses and the Twelfth Amendment.[11]

---

[10] Under the Clause, Congress has the power to carry into execution: (1) "the foregoing Powers," (2) "all other Powers vested by the Constitution into the Government of the United States"; and (3) "all other Powers vested by this Constitution . . . in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Number (1) does not apply because "foregoing powers" refers to the seventeen enumerated powers of Article I, section 8, and the Elector Clauses are in Article II. Number (2) does not apply because the Elector Clauses impose on the joint convention a duty—the electoral certificates "shall" be "counted"—not the discretion implied by the word "Power." Kesavan, 80 N.C. L. Rev. at 1736. Number (3) does not apply because Congress is not a "Department." *Hubbard v. United States*, 514 U.S. 695, 700 (1995).

[11] Scholars allow that Congress's counting role encompasses a threshold determination as to the "authenticity" of the electoral *certificates* (as opposed to the content of electoral *votes*), i.e., confirming that the certificates are "(i) signed, (ii) certified, and (iii) sealed." Kesavan, 80 N.C. L. Rev. at 1795. But the government argues that the "adjudication" creating the "official proceeding" here lies in Congress's purported power to render judgment on whether to certify the *votes* cast by Electors in the presidential election, i.e., the power to challenge the content of electoral votes.

**B.**    **Even If Congress Constitutionally Gave Itself "Adjudicative" Power over Presidential Elections in the ECA, That Act Did Not Bind Congress on January 6 under the Anti-Entrenchment Principle.  The ECA Is An Ambiguous, Hortatory House Rule, Creating Nonjusticiable Political Questions on Which Criminal Liability May Not Rest**

Even if the Congress of 1887 enjoyed the constitutional power to create adjudicative electoral vote procedures, it did not have the power to "entrench" the ECA, binding all future Congresses. 3 U.S.C. §§ 5, 15 (purporting to bind future Congresses to ECA procedures).

The constitutional anti-entrenchment principle forbids one Congress from "binding" another, *i.e.*, enacting legislation that purportedly cannot be altered under ordinary bicameralism and executive presentment procedure.  *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996); *INS v. Chadha*, 462 U.S. 919 (1983); Kesavan, 80 N.C. L. Rev. at 1793 (ECA violates anti-entrenchment principle).  That is particularly so with respect to the ECA, which purports to bind Congress to specific parliamentary rules.  Under the Rulemaking Clause, each Congress enjoys the power to set its own rules.  U.S. Const. Art. I, § 5, cl. 2 ("*each* House may determine the Rules of its Proceedings.") (emphasis added).  Therefore, even if the ECA's vote counting procedures were constitutionally "adjudicative" in 1887, that did not make the joint session on January 6 necessarily adjudicative.  Instead, to avoid constitutional conflict, the ECA is regarded as a precatory House rule in statutory form.  Kesavan, 80 N.C. L. Rev. at 1793.

That means the Defendants' criminal liability turns on this Court's interpretation of an ambiguous House rule (whether Congress's electoral vote count is an "official proceeding" turns on whether it is "adjudicative," which then turns on the Court's interpretation of the ECA).  Yet the D.C. Circuit has held that such a circumstance creates a nonjusticiable issue under the political question doctrine.  *United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995).  There, the

Court of Appeals held that the Rulemaking Clause is a "textually demonstrable commitment of the [interpretation of parliamentary rules] to a coordinate political department." *Rostenkowski*, 59 F.3d at 1304 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). And there is a "lack of judicially discoverable and manageable standards for resolving" a question that turns on ambiguous House rules. *Id.*

The notoriously obscure ECA parliamentary rules were manifested on January 6. The joint session, on whose "adjudicative" procedures the government's "official proceeding" argument turns, was suspended at 1:15 p.m. Eastern Time, fully more than an hour before the alleged obstructive acts in this case took place. 167 Cong. Rec. H77 (Jan. 6, 2021). This had nothing to do with the protesters who entered the Capitol but with the President of the Senate's order that "the two Houses . . .withdraw from the joint session" as a result of objections to the Arizona certificate by Members of Congress. *Id.* Even the obscure ECA provisions on which the government relies make clear that there was no possibility of the separated Houses accepting or rejecting electoral certificates before and during the protester intrusion. 3 U.S.C. § 15. Thus, the government asks the Court to find not only that a joint session to count electoral votes is an "official proceeding" under the obstruction laws but that a suspended one is too – pursuant to hypothetical House rules it declines even to cite.

Yet when a crime committed in Congress depends on the existence of a "competent tribunal" (in this case, an "official proceeding"), the legislature's House rules governing the requirements of such a proceeding must be satisfied. *Christoffel v. United States*, 338 U.S. 84, 88 (1949) (reversing perjury conviction concerning false testimony given to House committee because jury was allowed

30

to convict without finding that the committee's quorum rules were satisfied).[12]

These problems of parliamentary procedure would not be remedied even if the government changed its position to allege that the defendants prevented the joint session from *resuming*, *i.e.*, after the conclusion of the separated House objections to the Arizona certificate.  Even after the joint session "resumed" at 11:35 p.m. that day, objections to State certificates continued for several more hours.  167 Cong. Rec. H94 (Jan. 6, 2021).  The government does not allege that Ms.  Bauer remained in the Capitol building, or even in the vicinity, for that long.  If these (unconstitutional) certificate objections, which prevented the joint session from "resuming," continued for hours *after* protesters had been cleared from the Capitol, the government has not made, and cannot make, any argument that the defendants were causally responsible for a delayed "resumption" of the joint session, even assuming the question were justiciable.

---

[12]

*Christoffel* was decided before the Court formulated the modern political question doctrine in *Baker*.  As Justice Jackson noted in dissent in *Christoffel*, it was not the Court's role to put a judicial gloss on parliamentary rules.  338 U.S. at 91.  Yet even if Jackson's view on that point had prevailed in 1949, the perjury-in-Congress conviction may still have required reversal, under the future political question doctrine, if the House rules at issue were ambiguous.  *Rostenkowski*, 59 F.3d at 1304.

**Conclusion**

For all these reasons, the Court should dismiss the § 1512 count for failure to state an offense.

Respectfully submitted,

*/s/ Carmen D. Hernandez*

**Carmen D. Hernandez**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391
chernan7@aol.com

**CERTIFICATE OF SERVICE**

I hereby certify that the instant Motion was served this 4th day of February, 2022 via ECF on all counsel of record.

*/s/ Carmen D. Hernandez*
**Carmen D. Hernandez**