**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:21-cr-00386-TNM-2** |
| | : | |
| **PAULINE BAUER** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Pauline Bauer to a sentence of 78 months' incarceration based on an upward variance from the Guidelines range that the government anticipates this Court will calculate (and a midpoint sentence based on the government's Guidelines calculation), three years of supervised release, $2,000 in restitution and the mandatory $170 special assessment, and an appropriate fine.

## I.   INTRODUCTION

Bauer participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Bauer, a successful small business owner with a college degree, joined the storming of the police line on the East Plaza area of the United States Capitol.   Subsequently she was part of the mob that forced the United States Capitol Police (USCP) officers on the East Plaza to retreat to the East Rotunda door to try to prevent the rioters from infiltrating the Capitol.   After about forty minutes of struggle, Bauer, with her codefendant William Blauser, was able to force herself into the Capitol Building.   Once inside the Capitol Building and in the Rotunda, Bauer accosted Metropolitan Police Department (MPD) officers who were trying to secure the Rotunda.   Bauer physically accosted at least one officer and made incendiary threats to kill Nancy Pelosi, then the Speaker of the House of Representatives. Bauer was a short distance from Speaker Pelosi's office suite at that time.

## II.        FACTUAL BACKGROUND

### A.        The January 6, 2021 Attack on the Capitol

The government refers the court to paragraphs 23-26 of the draft presentence report, as well as the criminal complaint (ECF No. 1), for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.        Bauer's Role in the January 6, 2021 Attack on the Capitol

Bauer was among the group of rioters who illegally entered the U.S. Capitol grounds, and then the U.S. Capitol building, on January 6.   Bauer had traveled from her residence in Kane, Pennsylvania to attend the "Stop the Steal" rally in Washington, D.C.   Bauer also helped to organize transportation of others to the rally.   Bauer also traveled to Harrisburg, PA to a "Stop

2

the Steal" rally on January 5, 2021.   Bauer came to Washington D.C. as part of group that

included William Blauser, Sandra Weyer, Brian Korte, Lynwood Nester, and Michael Pomeroy.

Those persons are shown in Exhibit 313 (below).[2]



Exhibit 313 (left to right, Korte, Pomeroy, Bauer, Weyer, Nester, and Blauser)

Bauer was part of the crowd that gathered at the East Front of the United States Capitol

when the bicycle rack barricades were up and the area was monitored by USCP officers, as

---

[2] All of the members of the group picture have been arrested for their conduct related to the
events on January 6, 2021.   *See United States v. Korte, Nester, and Pomeroy*, 1:22-cr-00183-
TSC-1, *United States v. Weyer*, 1:22-cr-00040-EGS-1, *United States v. Blauser*, 1:21-cr-00386-
TNM-2.

shown in Exhibits 202 and 217a, below.



Exhibit 202 – 1:58:48 pm – Circled area where Bauer was present



Exhibit 217a

Bauer was also part of the crowd that first breached the East Plaza barricades at approximately

1:59 p.m., as shown in Exhibits 202 and 218a, below.



Exhibit 202 - 1:59:32 pm – Area where Bauer breached barricades

She was part of the original breach of the East Plaza barricades, as shown in Exhibit 218a below.



Exhibit 218a

Subsequently, Bauer was part of the crowd that forced members of the USCP to retreat up the stairs in front of the East Rotunda doors, as shown in Exhibit 221a, below.



Exhibit 221a

While she was on the terrace in front of the East Rotunda doors, Bauer and others were present when mace or pepper spray was used.   Moreover, before she rushed up the stairs to the East Rotunda doors, Bauer took a video that captures Weyer saying "they're macing, they're macing."   *See* Exhibit 316, elapsed time 0:00 – 0:25, see also Exhibit 118, elapsed time 06:50-06:56.   Shortly thereafter, Weyer, and others, admonish fellow rioters to "watch your eyes, watch your eyes."   Exhibit 118, elapsed time 07:23.   In close proximity to Bauer, Weyer's livestream captures the percussion of a flashbang and Weyer commented, in close proximity to Bauer, "teargas and flashbangs being disbursed at the Capitol."   Exhibit 118, elapsed time 09:04.   Standing right next to Bauer, who is directly in front of shielded USCP officers, Weyer

6

said, "yeah, flash bangs, pepper spray, we're still good though." Exhibit 118, elapsed time 09:40.

Bauer appeared unconcerned, as shown in Exhibit 118, below.



Exhibit 118 – still shot of video - lapse 09:30

At another point, in close proximity to Bauer, Weyer captured on video a woman who had been

maced walking away from the East Rotunda door, and Weyer offered encouragement and advice.

Seconds later, Bauer moved towards the East Rotunda door, obviously unaffected by any

chemical irritant.





Exhibit 118 – 13:14 elapsed          Exhibit 118 – 13:39 elapsed

Prior to pushing towards the East Rotunda door again, Weyer, with Bauer present, had a

conversation about "they're going to gas us" with a back-and-forth discussion about "how bad

will it be" and "they're going to have to gas themselves at the same time" and "yeah, yeah right,

so how bad is being gassed? Does anybody know?" Exhibit 118, 15:06- 15:42 elapsed.   At one

point near the East Rotunda doors, Weyer can be heard in a video saying to Bauer "get ready put

something on your face Pauline." Exhibit 118, 15:53 elapsed.

    Numerous rioters initially breached the East Rotunda doors by opening the doors from

inside the Capitol building at approximately 2:26 p.m.   Police officers resecured the doors, but

other rioters breached the doors again at approximately 2:36 p.m.   At 2:44 p.m., Bauer and

Blauser forced their way in through the East Rotunda doors that were being guarded by several

USCP officers, including Officer M.C., as shown in Exhibit 204, below.



Exhibit 204

Once inside the U.S. Capitol, Bauer went to the Rotunda.   On the west side of the

Rotunda, Bauer confronted MPD officers protecting the west entrance to the Rotunda.    Bauer

yelled at the officers "We want Nancy Pelosi, that's who we want."



Exhibit 212

Bauer then began screaming "Bring them out, You bring them out or we're coming in." Bauer continued to yell, stating "They're criminals.   They need to hang." She screamed at the officers "Bring Nancy Pelosi out here now.   We want to hang that fucking bitch. Bring her out."

At this point, Bauer was only feet from Speaker Pelosi's office:



*See* ECF No. 171, pg. 6

Bauer's threat to hang Speaker Pelosi was real, imminent, and placed the Speaker of the House in danger.   Publicly released video shows rioters searching for Speaker Pelosi on January 6, 2021.   *See* https://www.cbsnews.com/sanfrancisco/news/video-jan-6-rioters-searched-for-speaker-pelosi-after-her-evacuation-from-capitol/

When an MPD officer attempted to push Bauer away from the area he was protecting, she screamed at the officer, "Fuck you, you son of a bitch, you back up" and shoved the officer,

officer T.C.   Exhibit 213, below, shows Bauer at approximately the time of that altercation.



Exhibit 213



Exhibit 212

Bauer threatened, obstructed, and assaulted MPD Officer T.C.   As Officer T.C. testified:

12

So if it wasn't audible enough, this is Ms. Bauer stating, in her words, "Fuck you, you fucking [- - - -]" as I instruct her to back up. So at this point, she's no longer passive-aggressive; she's become aggressive. And the fact that she's pushing my efforts to -- and using a civil disturbance technique, which is to push our batons forward as we state for the crowd to back up, she's pushing back against my baton, telling me to back up.

And from Officer Lapitsky's point of view, you see that she uses both hands to push against me.

Transcript of trial, pg. 130.

Bauer's aggressive and assaultive behavior also incited the crowd.    After the assaultive

conduct by Bauer, Officer T.C. explained that:

Q. Okay. Is this situation now more treacherous than it was 60 seconds ago?

A. Yes, because anytime someone is actively resisting, that spark -- sparks are starting to fly. And we know that a fire can start from a spark. So at this point, I don't know if she is that spark, if the sentiment -- I can only speak for myself. I know I'm thinking at this time more so if I put this lady on her butt, then I have this group of men who will want to rescue her. It's just a reason for them to unite and ignite the situation because in their sense I'm picking on a female.

Transcript of trial, pg. 131. In fact, seconds after Bauer is pulled away from the officer by Mr.

13

Blauser, the crowd erupts in violence.



Exhibit 213

A short time later, MPD officers in riot gear physically ejected Bauer and other rioters from the Rotunda.

When police officers finally removed Bauer from the Capitol interior, she rejoined her friends, including Sandra Weyer, immediately outside of the East Rotunda door, as shown in

Exhibit 117, below.



Exhibit 117 – Weyer Livestream

When asked if she got maced and if she was ok, Bauer smiled and said something about being maced outside.   *See* Exhibit 117, elapsed time 19:50.

### Defendant's Statements

FBI agents obtained search warrants for Bauer's Facebook account and her cell phone. A review of the recovered material revealed that Bauer appeared to subscribe to a theory about the

election being stolen, that she traveled to Washington, D.C. prepared to commit violence, and that in the days following January 6, she had no remorse for her conduct on that day.

Before January 6, 2021, Bauer wrote on her Facebook account that "this fight is not over." On January 4, 2021, Bauer posted a "minifeed" message stating:

> **Time** 2021-01-04 02:25:20 UTC
> **Message** This trip has been canceled because of lack interest. This is copied for those still Copied from a friend: For those who would like to go to Washington DC to protest the steal of our presidential election, there will be a bus departing 3 am Dubois mall January 6 Returning 1030 pm. Someone sponsored the first bus so it is for free. They are working on another free bus. Call Clara. 598-6315. Despite what our wonderful media has gas lighted us with, this fight is not over. Get off of your hands and stand up for your country. If the bus doesn't fill up there may be a small charge.

Exhibit 100

On January 6, 2021, Bauer embraced the idea that she took back her country from communism.  Bauer posted:

> **Comments**
> **Summary** Pauline Bauer commented on a post from January 6. `I am at the capital and was inside. No of us are armed just pissed that this is what we have to do to take our country back from communism`
> **Object Id** S:_I100005688286662:10219274453435640:1

Exhibit 101

Bauer also acknowledged that she "took over" the Capitol, posting:

> **Time** 2021-01-06 20:53:07 UTC
> **Type** Comments
> **Summary** Pauline Bauer commented on a post from January 6. `We took over our capital like patriots for a stolen election one person was shot with a rubber bullet by the cops`
> **Object Id** S:_I100005688286662:10214539783728789:3

Exhibit 101

After Bauer left the Capitol, she posted:

| | |
|---|---|
| **Time** | 2021-01-07 00:48:15 UTC |
| **Type** | Comments |
| **Summary** | Pauline Bauer replied to your comment on a post from January 6. |
| | `@[1326920494:2048:Carol Northrop] we took back what rightfully belongs to we the people ` |
| **Object Id** | S:_I100005688286662:10219274453435640:4 |

| | |
|---|---|
| **Time** | 2021-01-07 00:47:29 UTC |
| **Type** | Comments |
| **Summary** | Pauline Bauer replied to your comment on a post from January 6. |
| | `@[100001422223979:2048:SherandRon Morse] you can thank me after you start researching that these Democrats not only cheated and stole this election from the people but they have been trafficking children for years` |
| **Object Id** | S:_I100005688286662:10219274453435640:3 |

Exhibit 102

After the breach, Bauer also posted:

| | |
|---|---|
| **Time** | 2021-01-07 01:03:38 UTC |
| **Type** | Comments |
| **Summary** | Pauline Bauer commented on a post from January 6. `They were us and we took our capital back today. Nancy went out through the tunnels. ThAt cowering little bitch` |

| Facebook Business Record | Page 106 |
|---|---|

**Photo ID**

1677899352409658

| | |
|---|---|
| **Time** | 2021-01-07 00:59:58 UTC |
| **Type** | Comments |
| **Summary** | Pauline Bauer commented on a post from January 6. `There was no Antifa just pissed off patriots` |
| **Object Id** | S:_I100005688286662:10219274453435640:13 |

| | |
|---|---|
| **Time** | 2021-01-07 00:58:25 UTC |
| **Type** | Comments |
| **Summary** | Pauline Bauer commented on a post from January 6. `We are done with the bullshit, we have been peaceful since April` |
| **Object Id** | S:_I100005688286662:10219274453435640:12 |

Exhibit 103

Apparently referencing her earlier threats to hang Speaker Pelosi, Bauer posted "Nancy went out though the tunnels.   ThAt cowering little bitch."   Exhibit 103.   As if there was any

doubt that Bauer intended to stop the Electoral College Certification process, days after the riot, she posted:

> **Time**     2021-01-08 13:01:08 UTC
> **Type**     Comments
> **Summary**  Pauline Bauer replied to your comment on a post from January 6. `Do you really think anyone could break into the capital. The antagonists were let in. We all got maced trying to stop what was happening. They used us for a movie so you could watch it on the news`
> **Object Id** S:_l100005688286662:1021927445343540:26

Exhibit 105

**Bauer's False Testimony at Trial**

Unable to offer an innocent explanation for her conduct, Bauer gave materially false testimony to the Court at trial regarding the only elements in dispute: her knowledge and criminal intent.   Bauer went beyond a mere denial of guilt, lack of memory, or confusion: she offered an alternative, demonstrably false explanation for her confrontation with the police.   Some of Bauer's more egregious false testimony includes, but is not limited to:

- She thought it was over around 1:20 pm – Transcript of trial, Jan. 19, 2023, pg. 233.

- She didn't know "about any of this process." *Id*., at 235.

- She just wanted her voice to be heard. *Id.*, at 236.

- "I didn't even know that was going on. I thought it was over, that it was decertified by Mike Pence. And all those Secret Service vehicles pulled out at 2:00." *Id.*, at 239.

- She doesn't remember threatening Nancy Pelosi and she didn't know what happened to her. *Id*., at 240.

- The reason for demanding to "bring them out" was the crimes against humanity for this whole virus, for everything that got suppressed, for their interaction with social media. *Id*., at 241.

- She was not in a rage until she got maced.   *Id.*

18

- She doesn't remember anything after she got maced. *Id.*

- She didn't want Speaker Pelosi to be dead, she just wanted justice to be served and for her to be arrested. *Id.*, at 242.

- She doesn't remember saying those words ("Bring her out. She needs to hang"). *Id.*, at 243.

- She doesn't know what she meant that day. *Id.*, at 244.

- She thought members of Congress left in the motorcade. *Id.* at 245.

- She just walked into the Capitol or was "pushed" into the Capitol. *Id.*, at 251.

- She said she thought only Mike Pence could decertify the election. She "guessed" that she said on Facebook on January 4, 2021 "Make sure you decertify the presidential election, Nancy. The Lord is watching." *Id.*, at 256.

Fittingly, while announcing the guilty verdicts, this Court stated, "I also on the subject of sentencing will consider a Government motion for departure in light of the Defendant's obstruction while on the witness stand." Transcript of verdict, Jan. 24, 2023, pg. 17. In light of Bauer's perjured trial testimony, this Court should impose the U.S.S.G. § 3C1.1 enhancement for obstruction of justice. Several other judges of this Court have imposed that enhancement after finding that other January 6 defendants gave false testimony regarding their criminal conduct at trial, and it is warranted here. *See United States v. Bledsoe*, 21-cr-204 (BAH) (applying the two-level obstruction enhancement after the defendant falsely testified about his knowledge of the vote certification); *United States v. Thompson*, 21-cr-161 (RBW) (applying the two-level obstruction enhancement after finding that the defendant falsely testified about his whereabouts and other material facts related to his actions on January 6).

19

### III.    THE CHARGES AND TRIAL

Bauer was arrested on May 19, 2021 and charged by complaint with five offenses: violations of 18 U.S.C. §§ 1512(c)(2), 2 (Obstruction of an Official Proceeding); 18 U.S.C. § 1752(a)(l) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C.   § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).   ECF No. 1.   On June 4, 2021, she was charged with the same offenses in an indictment, and a superseding indictment with the same charges followed on March 16, 2022.   ECF Nos. 11, 116.   After a two-day trial, the Court found Bauer guilty of all offenses on January 24, 2023. *See* transcript of bench trial verdict, *United States v. Bauer*, No. 21-00386-2, January 24, 2023.

### IV.    STATUTORY PENALTIES

Bauer now faces sentencing on five counts, with the following maximum penalties:

- obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One) (up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100),

- entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two) (up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25);

- disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three) (same penalties as for Count Two);

- disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four) (up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10); and

- parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. §

20

§ 5104(e)(2)(G) (Count Five) (same penalties as for Count Four).

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The offense level calculation here is driven by Count One, obstruction of an official proceeding.

The government understands that this Court has ruled that two specific offense characteristics (an eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B) and a three-point enhancement under U.S.S.G. § 2J1.2(b)(2)) do not apply to conduct like Bauer's on the ground that obstruction of the Congressional certification does not qualify as interference with the "administration of justice." *See United States v. Seefried*, No. 21-CR-287 (TNM), ___ F. Supp. 3d ___, 2022 WL 16528415, at *11 (D.D.C. Oct. 29, 2022).   The government preserves its objections regarding the applicability of these enhancements here, *see, e.g., United States v. Kevin Seefried*, 1:21-cr-287 (TNM), ECF 135, pp. 20-24 (government sentencing memorandum filed February 2, 2023).   Moreover, the facts of Ms. Bauer's case support the application of both enhancements here.   As for the eight-point enhancement under 2J1.2(b)(1)(B) that applies to conduct "threatening to cause physical injury," it is hard to imagine a more stark threat of the most extreme physical violence than when Bauer, her faced contorted in rage, screamed at the police officers in the Rotunda in the midst of a full-scale riot, "Bring them out, You bring them out or we're coming in"; "They're criminals. They need to hang."; "Bring Nancy Pelosi out here now. We want to hang that fucking bitch. Bring her out."   And as for the three-point enhancement under U.S.S.G.

§2J2.1(b)(2) for substantial interference with the administration of justice, this Court has found that rioters "were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hunter Seefried*, 21-cr-287 (TNM), 10/24/22 Sentencing Hearing Tr. at 54.

The U.S. Probation Office correctly calculated Bauer's offense level as follows:

Base Offense Level: The guideline for 18 USC § 1512(c)(2) offenses is found in USSG §2J1.2 of the guidelines. That section provides that an offense involving obstruction of justice has a base offense level of 14. USSG §2J1.2(a).                    14

Specific Offense Characteristics: Because the offense involved causing or threatening to cause physical injury to a person (specifically, Speaker of the House Nancy Pelosi), or property damage, in order to obstruct the administration of justice, eight levels are added. USSG §2J1.2(b)(1)(B).                    +8

Specific Offense Characteristics: Because the offense resulted in the substantial interference with the administration of justice (specifically, the proceeding before Congress, to wit: Congress's certification of the Electoral College vote), three levels are added. USSG §2J1.2(b)(2).                    +3

Victim Related Adjustment: None                    0

Adjustment for Role in the Offense: None.                    0

Adjustment for Obstruction of Justice: The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added. USSG §§3C1.1 and comment. (n.3).                    +2

Adjusted Offense Level (Subtotal):                    27

Chapter Four Enhancement: None.                    0

Acceptance of Responsibility: As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.                    0

**Total Offense Level:**                                                                27

This calculation reflects Probation's adjustment for "Obstruction of Justice" under U.S.S.G. § 3C1.1 based upon Bauer's lack of truthfulness in testifying.   Draft PSR ¶¶  38, 40, 56. This assessment is correct, and the government asks to Court to credit the two-point enhancement. False testimony clearly supports an enhancement under the Guidelines for obstruction of justice. *United States v. Brockenborrugh*, 575 F.3d 726, 740 (D.C. Cir. 2009) ("Because Brockenborrugh's testimony about this latter threat was untruthful, we conclude that the district court did not clearly err in deciding that Brockenborrugh's trial testimony contradicted what he had told Robinson and warranted an enhancement for obstruction of justice").   Here, Bauer's testimony was clearly false. Pursuant to *United States v. Dunnigan*, 507 U.S. 87 (1993), the government requests that the Court make explicit on the record that the obstruction of justice enhancement is appropriate and supported by her false testimony. *Id.* at 95 ("if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out") (citation omitted).

The draft PSR does fail to include a full Guidelines analysis for all three Counts to which the Guidelines apply under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR concludes (see PSR ¶ 49) that Counts

One, Two, and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).[3]   The Guidelines calculation for Counts Two and Three is as follows:

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---:|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds[4] | +2 |
| U.S.S.G. §2B2.3(c)(1) | Cross-reference[5] | |
| U.S.S.G. §2X1.1(a) | Base Offense Level | <u>25</u> |
| U.S.S.G. § 3C1.1 | | +2 |
| | **Total** | **27** |

Count Three: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---:|
| U.S.S.G. §2A2.4(a) | Base Offense Level | <u>10</u> |
| | **Total** | **10** |

**Combined Offense Level**                                         **27**

Because Congress was the victim of all three offenses of conviction, all three counts group. See U.S.S.G. § 3D1.2(a). The offense level for the group is 27. U.S.S.G. § 3D1.2(a). The government does not dispute that Bauer's criminal history category is I.   An offense level of 27 and a criminal history category of I results in a guidelines range of 70-87 months.

---

[3] As the draft PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Four or Five here.

[4] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. §2B2.3 cmt. n.1.

[5] The cross-reference applies since the Section 1752(a)(1) offense was committed with an intent to commit a felony (18 U.S.C. § 1512). *See* U.S.S.G. § 2B2.3(c)(1) and § 2X1.1 n.2.

**SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration, and supports an upward variance, from the range the government expects the Court will calculate to a 78-month sentence.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of the offense strongly support the government's requested sentence.    As this Court stated in another January 6 case, "Regardless of whether the 'administration of justice' language actually applies to this situation, I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding." *United States v. Hale-Cusanelli*, No. 21-cr-37 (TNM), 9/22/22 Sentencing Hrg. Tr. at 86.    In *Hale-Cusanelli,* the Court varied upward, but not a full eleven levels, because, even if the +8 enhancement for causing or threatening injury or property damage was available as a matter of law, Hale-Cusanelli's own conduct was not the type warranting the enhancement.    *Id.* at 85 ("I think the eight-level enhancement under guideline 2J1.2(b)(1)(B) is too severe, given that you yourself didn't injure or threaten anyone, nor did you damage any property").    Bauer's case, however, is different.    She shoved officers and she threatened Speaker Pelosi.    Her conduct "involved causing or threatening to cause physical injury to a person."

Indeed, Bauer's obstructive conduct encompassed both verbal and physical threats of the type have supported felony convictions in other cases.    Bauer's shove of Officer T.C. was one

moment in a physically obstructive course of conduct.    A comparison of her conduct with another well known participant in the riot, Richard Barnett (who posed for a picture with his feet propped up on Speaker Pelosi's desk), clearly shows that Bauer was physically obstructive as well as assaultive.    In *United States v. Barnett,* 21-cr-38 (CRC), Barnett was convicted by a jury of civil disorder, in violation of 18 U.S.C. § 231(a)(3), for engaging in the same conduct as Bauer, at the same location, at the same time, with the same officers.    Government's Exhibit 204 B in *Barnett* shows defendant Barnett struggling with MPD officers as Bauer is also struggling with officers.



*Barnett*, No. 21-cr-38 (CRC), Trial Exhibits ECF No. 157.    As the government argued at trial, Barnett interfered with officers as follows:

> The defendant's presence up in Officer Craig's face, belligerent, yelling at him, all of that impeded or interfered with Officer Craig's ability to hold that line, because all of his attention has to be focused on the man up in his personal space right in front of him. …
> that weakens his ability to hold the line with everybody else. The defendant's demanding

all of his attention.

Trial Tr., *United States v. Richard Barnett*, No. 21-cr-38 (CRC), Jan. 20, 2023, p. 1844-45.   In

exactly the same way, Bauer impeded and interfered with Officer T.C.'s ability to hold the line.

She impeded and interfered with Officer T.C.'s ability to protect that area of the Rotunda.   Bauer

also impeded and interfered with Officer T.C.'s ability to assist his fellow officers.   To some

extent, Bauer's conduct is more extreme than that of Barnett because she put hands on Officer

T.C., pushed him, and yelled "Fuck you, you son of a bitch, you back up."   *See* Exhibit 213, BWC

video of Officer T.C.   Ironically, and significantly, at the precise time Bauer yelled at Officer

T.C., Barnett was right next to her, obstructing a different officer:



Exhibit 213 at 2:58:04 pm.

Bauer also threatened to kill Speaker of the House Nancy Pelosi—because she disagreed

with the way she was handling the Electoral College Certification process.   Bauer made the threat

in the Rotunda of the United States Capitol, a short distance from the Speaker's Offices.   The

substance of her threats, the context in which they were made, and the surrounding circumstances

make clear that Bauer's conduct, verbal and physical, put Speaker Pelosi's life in danger on January 6, 2021.   The Court's sentence should reflect the gravity of her conduct and threatening statements.   *See United States v. Frank Caporusso*, No. 20-cr-171 (TNM).   In *Caporusso*, the defendant left a voice mail message on a Judge's telephone line.   In contrast, Bauer made the threat in person, mere feet from where Speaker Pelosi's offices were located.   As shown in Section II(B) of this memorandum, Bauer's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis.

In summary, Bauer was part of the mob that initially breached the East Side of the Capitol at approximately 1:59 pm.   Bauer was part of the mob that initially charged the steps of the East Side of the Capitol that forced USCP officers to fall back to the East Rotunda door.   Bauer was part of the mob that forced its way in when USCP Officer M.C. was valiantly trying to secure the East Rotunda door.   Bauer was part of the mob that threatened lawmakers and assaulted MPD officers, including Officer T.C., who were trying to safeguard protected areas of the Rotunda – shoving an officer herself. Meanwhile, within striking distance of Speaker Pelosi's office, she called for the Speaker to hang.   The nature and circumstances of Bauer's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

### B.  Bauer's History and Characteristics

Bauer is a 55-year-old business owner from Kane, Pennsylvania.   Bauer is a college graduate, who graduated summa cum laude with a GPA of 3.76.   Since 2006, Bauer has owned

and operated Bob's Trading Post in Kane, Pennsylvania.   Her financial assets exceed her liabilities by several hundred thousand dollars.   She grew up in a stable household, the product of an intact family.   Her parents remained married for over 50 years.   By her own description, she had a "positive childhood." Draft PSR ¶ 72.

When Bauer was detained pending trial, she had several medical complaints.   The government notes that, as a result of the medical care she received at the D.C. jail, and Howard University Hospital, Bauer was diagnosed with a pre-existing condition of which she was apparently unaware, and which she was then able to treat.   While incarcerated, she advised jail officials that she had previously been diagnosed with a separate condition, which was apparently not the source of her medical complaint.   PSR ¶ 81, fn. 6.   Bauer has never suffered from, or been treated for, any mental or emotional health problem.   PSR ¶ 92.   She is not an alcoholic and is not addicted to any controlled substances.   *See* Draft PSR ¶ 96-99.

Showing her contempt for the law, and indicating a likelihood that she will reoffend, Bauer employed sovereign citizen rhetoric and has demonstrated hostility towards the Court system and the laws of the United States.   She was incarcerated by the Court only after she refused to recognize its authority and abide by conditions of release.   At her intake in jail in September 2021, Bauer claimed that she was "being harassed by the courts as she was invited into the US Capitol by US Capitol police." *See* Draft PSR ¶ 94.

Bauer has filed, and attempted to file, nonsense pleadings to obstruct the administration of the case, when she knew better.   On September 1, 2021, Bauer filed a 114-page pleading challenging the jurisdiction of the Court.   *See* ECF No. 51.   That pleading provided, in part, that:

> I, me, Pauline from the house of Bauer challenge the courts jurisdiction over me, a living woman, one of we the people, creator of Government. My status is clearly defined in my Notice of Special Appearance, that has already been filed. As a Free living Soul, Sui Juris, Jus Soli, an ambassador of Christ, Attorney in fact, I demand that this be a Constitutional Court of Record, that there will be no Presumptions, assumptions, no tacit agreements, no waiver of rights, no subversion of rights, no hearsay, no lawyering, or attornment from the bench. I do not plead with the court, I do not plead guilty, I do not plead not guilty, I declare my innocence. I am counting on you to be a honorable man, and I must ask you: are claiming your authority over me from your oath of office? Are you claiming to derive your authority over me from the doctrine of PARENS PATRIAE? Are you claiming to derive your authority over me from THE UNITED STATES, THE UNITED STATES OF AMERICA, statute(s), code(s), ordinance(s), by-law(s) of a corporation? Please list the authority(s) where you exercise dominion over me. May I have written confirmation that all requirements have been met and are up to date?

ECF No. 51, pg. 2.   Bauer's contumacious behavior increases the likelihood that she will reoffend.[6]

Confronted with similar type pleadings, the Fifth Circuit has held that "we perceive no need to refute these arguments with somber reasoning and copious citation of precedent; to do so might suggest that these arguments have some colorable merit . . . [Petitioner's argument] is a hodgepodge of unsupported assertions, irrelevant platitudes, and legalistic gibberish." *Crain v. Commissioner*, 737 F.2d 1417, 1418 (5th Cir. 1984).   *See also* ECF No. 52.   More significant, Bauer, as a *pro se* defendant at the time, filed a cogent, articulate, motion to dismiss on February 22, 2022, incorporating some of the arguments filed by licensed attorneys in other January 6, 2021 cases.   *See* ECF No. 113.   The import is clear.   Bauer knows better.   She is a well-educated citizen.

---

[6] The government notes that Bauer apparently blames others for the defiant, and nonsensical, arguments she personally filed.   *See* Motion to Reconsider Conditions of Release, ECF No. 137, pg. 4, transcript of hearing, April 28, 2022, pg. 12 "I was misled in the beginning, and I realize that."

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bauer's criminal conduct on January 6 was the epitome of disrespect for the law. She further showed disregard for the law after being arrested, so much so that the Court felt that her own unwillingness to follow its orders required her detention pretrial for a period of time.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Bauer has now expressed remorse and contrition, her social media statements on and after January 6 were those of a woman girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Second, Bauer's willingness to be untruthful when testifying demonstrates not only a lack of remorse but, more troubling, a concerted effort to subvert the legal process.

> Bauer provided the following written statement to Probation:
>
> I am so sorry that I got caught up in the crowd at the [C]apitol. I wish I could take back that day and all the pain that I have caused by family. I just want to move on from this incident and concentrate on the restaurant, which I don[']t think will make it if I go back to jail. I want to spend more time gardening and foraging in the National Forest and express no desire to ever step foot in Washington, DC again.

Draft PSR, ¶ 39.   Not only does Bauer's statement ring hollow, it is the opposite of remorse. Bauer expresses regret, not for her volitional conduct, but for the fact that she "got caught up in the crowd" and that she got caught.   She did not get "caught up in the crowd," she was a very active member of the crowd.   She was with the leaders of the breach of the East Plaza barricades. Bauer started the harassment and the escalation of violence against MPD Officer T.C. and aggravated the situation by her direct conduct.   She apologizes for the pain she caused—but not to any of the police officers injured or staffers or members of Congress terrorized that day, only to her own family.   As she did in her trial testimony, Bauer tries to appeal to the Court's sympathy for a small business owner, stating that she doesn't think her restaurant, jointly owned with her husband, "will make it" if she goes back to jail.   *Id*.   She made the same claims when her release was revoked for her refusal to follow the conditions of release.   *See* ECF No. 60 at 1.   She made

the same claim to explain her conduct on January 6, 2021.   *See* Jan. 19, 2023 Hrg. Tr., at 214.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Williams*, No. 1:21-cr-377 BAH, the defendant issued a series of social media posts expressing his anger that Donald Trump lost and stating his intention to go to the Capitol on January 6 and "Hold the Line" to stop the certification of the election results. On January 6, he joined a group of rioters on the West Front where he helped them climb bicycle

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

racks. He recorded himself on those stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody. Fuck that, we took this fucking building." He then stole water bottles that police had stored on the Upper West Terrace of the Capitol building that were supposed to be used for decontamination.   He then entered the Capitol and was part of the crowd that overran the police in the Crypt.   He advanced to the Rotunda where he celebrated with other rioters and smoked marijuana. When the police tried to force Williams out of the Rotunda, he joined with other rioters and actively resisted and mocked the police. Williams later bragged on social media about his actions and expressed no remorse. Williams' conduct is somewhat dissimilar to Bauer's, however.   He did not shove an officer, did not threaten to kill Speaker Pelosi, and did not receive a two-point obstruction enhancement for his trial testimony.   His Guidelines range was thus lower than Bauer's –57-71 months.   Judge Howell sentenced him to 60 months' incarceration.   Bauer deserves a higher sentence.

*United States v. John Douglas Wright*, No. 21-cr-341 (CKK) is another January 6 case with some similarities to this case, but less egregious conduct.   Like Bauer, Wright was at the forefront of the breach on the East Plaza side of the Capitol.   Like Bauer, Wright posted provocative rhetoric on social media prior to the riots, saying "TODAY WE TAKE GEORGIA TOMORROW WE TAKE OUR COUNTRY BACK (SOUND FAMILIAR)."   Like Bauer, Wright arranged for buses to take protestors to the U.S. Capitol on January 6, 2021.   Wright engaged in physically aggressive behavior with USCP officers when he pushed a bicycle rack barricade into officers at the start of the East Plaza breach.   Bauer engaged in physically aggressive behavior when she

pushed against Officer T.C. as he was trying to get her to leave the area.    Wright also made entry through the East Rotunda door and remained in the Capitol for 12 minutes.

Wright, unlike Bauer, pleaded guilty to violating 18 U.S.C. § 1512(c)(2). Judge Kollar-Kotelly sentenced Wright to 49 months' incarceration.    Unlike Bauer, Wright accepted responsibility for his conduct, and did not lie to the Court about his conduct and behavior on January 6, 2021, and did not threaten to hang the Speaker of the House of Representatives.    Bauer deserves a higher sentence than Wright. *See also United States v. Bledsoe*, 21-cr204 (BAH) (48 month sentence for obstruction conviction).

The Court is undoubtedly aware of the 48-month sentence it imposed in *United States v. Timothy Hale-Cusanelli*, (21-cr-37-TNM), where the defendant testified falsely and was convicted of the same five counts.    The Government asked for a 78-month sentence in *Hale-Cusanelli*. Unlike Hale-Cusanelli, Bauer engaged in physical violence on January 6, 2021 and Bauer threatened to kill the Speaker of the House of Representatives. The Court also noted that Hale-Cusanelli had extenuating personal circumstances; Bauer's background suggests no such hardship. Bauer's conduct at the Capitol and false testimony similarly distinguishes her from Hatchet Speed, whom the Court also recently sentenced to 48 months' imprisonment following convictions on the same charges.    *United States v. Speed,* 22-cr-244 (TNM).

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Bauer was convicted of violating 18 U.S.C. § 1512()(2), the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Bauer to pay $2,000 in restitution for his convictions in this case. This amount fairly reflects Bauer's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

Bauer's conviction under Section 1512 subjects her to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the revised Draft PSR notes, "According to www.givesendgo.com records (a crowdfunding page), there is an account for the defendant titled "Legal Defense Fund for Pauline Bauer." As of March 14, 2023, $2,291 has been raised; there is a $50,000 goal." Draft PSR ¶ 78.   Bauer should not be able to capitalize on her participation in the Capitol breach in this way.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a midpoint sentence of 78 months' incarceration, three years of supervised release, $2,000 in

restitution, the mandatory $170 special assessment, and an appropriate fine.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     ___/s/ James D. Peterson_____
James D. Peterson
Trial Attorney
Bar No.: VA 35373
United States Department of Justice
1331 F Street N.W.
  6th Floor
Washington, D.C. 20530
Desk: (202) 353-0796
James.d.peterson@usdoj.gov

41